# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

John Sanny and Diana Sanny,

Plaintiffs,

v.

**MEMORANDUM OPINION AND ORDER**
Civil No. 11-2936 ADM/SER

Trek Bicycle Corporation,

Defendant.

_____

Terry L. Wade, Esq., Vincent J. Moccio, Esq., and Brandon E. Vaughn, Esq., Robins, Kaplan, Miller & Ciresi, LLP, Minneapolis, MN, on behalf of Plaintiffs.

Stephen J. Foley, Esq., Michael W. Haag, Esq., and Steven J. Erffmeyer, Esq., Foley & Mansfield, PLLP, Minneapolis, MN, on behalf of Defendant.

_____

# I.  INTRODUCTION

Plaintiffs John and Diana Sanny assert claims of design defect, failure to warn, and failure to provide post-sale warnings against Defendant Trek Bicycle Corporation's ("Trek").[1] On March 22, 2013, the undersigned United States District Judge heard oral argument on Trek's Motion for Summary Judgment [Docket No. 77], Motion to Exclude Testimony of Plaintiffs' Expert Witness David Hallman [Docket No. 76] ("Motion to Exclude"), and Motion to Strike Changes to Deposition of Plaintiffs' Expert David Hallman [Docket No. 70] ("Motion to Strike").  For the reasons stated herein, Trek's Motion for Summary Judgment is granted in part, its Motion to Strike is granted, and its Motion to Exclude is granted in part.

_____

[1] Plaintiffs withdrew their claims for negligent failure to recall and negligent failure to advise the Consumer Product Safety Commission of a product hazard, conceding Minnesota law does not recognize these claims.  Pls.' Mem. Opp. Summ. J. [Docket No. 95] ("Pls.' Opp.") 48-49.

## II. BACKGROUND

**A. Sanny's Accident**

At the time of his accident in 2009, John Sanny ("Sanny") taught tennis and other classes at the University of Minnesota's Minneapolis campus. Vaughn Aff. [Docket No. 96] Ex. UU ("Sanny Dep."), at 18, 33-34. In 1993, Sanny purchased a used Model 930 Single Track bicycle, manufactured by Trek in 1990. The bicycle had a quick release mechanism, which allowed Sanny to quickly remove and replace the front wheel. About every 2-4 weeks, Sanny commuted to Cooke Hall, where he had an office, by driving to campus, parking in a nearby surface lot, and then riding his bicycle the remainder of the trip. Id. at 14-15. To fit his bicycle inside his car, Sanny routinely removed the bicycle's front wheel. Id.

On September 10, 2009, Sanny arrived at the campus parking lot in the morning, about one hour before his class. Id. at 30. Sanny removed his bicycle from his car and attached the front wheel. Id. at 15-18. He then rode his bicycle about two-and-a-half blocks to Cooke Hall and entered the building before realizing he had left his keys in his car. Id. at 21, 30-31. Sanny returned to his bicycle and headed back to the parking lot to retrieve his keys. Id. at 30-31. As he approached the parking lot, he "bunny-hopped" a curb to cross the street. Id. at 24-25, 31; Haag Aff. [Docket No. 85] Ex. 2 (Map of accident site). The front wheel of his bicycle came loose and caught on the front brakes, causing the bicycle to come to a sudden stop. Vaughn Aff. Ex. VV ("Hallman Report"), at 2. Sanny was thrown face-forward off of his bicycle. See id. The first campus police officer to respond found Sanny on the pavement, bleeding and suffering from serious head and facial injuries. Vaughn Aff. Ex. A ("Welsh Dep."), at 45-46.

On or about September 19, 2011, Plaintiffs filed suit against Trek. Plaintiffs allege Trek

negligently failed to incorporate a "secondary retention system" into the design of Sanny's bicycle, which would have acted as a safety mechanism when Sanny's wheel detached. Compl. 2. Plaintiffs also allege Trek failed to warn Sanny of the risk of front wheel detachment in bicycles without secondary retention devices. Id. Finally, Plaintiffs argue they have stated a third claim alleging Trek's post-sale failure to warn Sanny. Trek argues Plaintiffs did not sufficiently plead this claim.

**B. Quick Release Device**

A quick release mechanism, like the one used in Sanny's bicycle, involves three major components: a bicycle fork designed for quick release use, a front wheel designed for the same, and the quick release device itself. In a bicycle equipped for a quick release tire, the front "fork blades"—the arms of the bicycle which hold the wheel—each end in an open, u-shaped "dropout." The front wheel has a hollow axle, meaning the axle has a narrow, cylindrical hollow space running its length. The quick release device is a skewer that has an adjustable nut on one end and a lever on the other.

To connect the wheel to the bicycle, the quick release skewer is placed through the hollow of the front wheel's axle, so that it protrudes on either end by a small amount. The wheel is then placed between the fork blades, so that the dropouts fit on to the skewer, on either side of the wheel axle. To secure the wheel to the bicycle, the rider tightens the nut on one end of the quick release device and presses the lever inward 90 degrees (relative to the skewer) on the other end. The lever, acting as a cam, tightens the skewer so that the quick release device is pushing in on each dropout from the outside. This pressure ensures the wheel does not detach during riding; the wheel is essentially "pinched" in place.

3

The alleged danger with quick release wheels is the risk that the quick release nut and/or lever become loose or completely undone during a ride.  Because friction is the primary force keeping the wheel attached to the bicycle, a loss of "grip" by the quick release device means the dropouts are simply resting on top of the quick release skewer.  If the rider of the bicycle in this situation lifts the front of his bicycle off of the ground, makes a sharp turn, or takes a similar action, the rider risks lifting the dropouts off of the axle and detaching the front wheel in mid-ride.  In the present case, Plaintiffs and Trek agree that Sanny's action in "hopping" over a curb to cross the street caused the front fork of his bicycle to lift off of and thus detach from his front wheel.

## III.  DISCUSSION

### A.  Motion for Summary Judgment

#### 1.  Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure states a court shall grant summary judgment if no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law.  On a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).  If evidence sufficient to permit a reasonable jury to return a verdict in favor of the nonmoving party has been presented, summary judgment is inappropriate.  Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995) (citations omitted).  However, "the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment. . . .  Instead, 'the dispute must be outcome determinative under prevailing law.'"  Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992) (citations omitted).

2.  **Design Defect**

To establish a design defect claim under Minnesota law, a plaintiff must present specific facts establishing three elements: (1) the product was in a defective condition, unreasonably dangerous for its intended use; (2) the defect existed when the product left the manufacturer's control; and (3) the defect proximately caused the plaintiff's injury.  Westbrock v. Marshalltown Mfg. Co., 473 N.W.2d 352, 356 (Minn. Ct. App. 1991) (citing Bilotta v. Kelley Co., Inc., 346 N.W.2d 616, 624 (Minn. 1984)).  Whether a product is defective is usually a question of fact; "only when reasonable minds cannot differ does the question become one of law."  Thompson v. Hirano Tecseed Co., Ltd., 456 F.3d 805, 809 (8th Cir. 2006).

For both negligence and strict liability claims, Minnesota courts use a "reasonable care" balancing test to determine whether a product is defective.  Thompson, 456 F.3d at 809.  Under this balancing test, a product is unreasonably dangerous, and thus defective, if the manufacturer:

> fails to exercise that degree of care in his plan or design so as to avoid any unreasonable risk of harm to anyone who is likely to be exposed to the danger when the product is used in the manner for which the product was intended, as well as an unintended yet reasonably foreseeable use.
>
> What constitutes "reasonable care" will, of course, vary with the surrounding circumstances and will involve a balancing of the likelihood of harm, and the gravity of harm if it happens, against the burden of the precaution which would be effective to avoid the harm.

Mozes v. Medtronic, Inc., 14 F. Supp. 2d 1124, 1127 (D. Minn. 1998) (citing Bilotta, 346 N.W.2d at 621).

The parties dispute whether Sanny's bicycle was unreasonably dangerous because it had no secondary retention device.  Viewed as a whole, the evidence submitted by the parties would allow reasonable minds to disagree regarding whether Trek used reasonable care in choosing not

to include a secondary retention device in the design of Sanny's bicycle. Each category of evidence presented by the parties is discussed below.

### a. Feasible alterative design

While not a prima facie element of a design defect claim, an important factor in determining whether a product is unreasonably dangerous is the availability of a feasible, safer alternative design. Kallio v. Ford Motor Co., 407 N.W.2d 92, 96-97 (Minn. 1987); Young v. Pollock Eng'g Group, Inc., 428 F.3d 786, 789 (8th Cir. 2005). If, at the time the manufacturer designed the product at issue, a safer, feasible design existed, it weighs in favor of finding the contested design unreasonably dangerous. Implicit in this evaluation, however, is the balance between utility and safety. If the alternative design increases safety at the cost of performance or utility, it may warrant the conclusion that the alternative design is not feasible. See, e.g., Unrein v. Timesavers, Inc., 394 F.3d 1008, 1012 (8th Cir. 2005) (holding expert must demonstrate proposed safety modifications do not "interfere with the machine's utility"); Sobolik v. Briggs & Stratton Power Prods. Group, LLC, No. 09-1785, 2011 WL 1258503, at *4-5 (D. Minn. Mar. 30, 2011) (finding plaintiff had submitted sufficient evidence to create question of fact on issue of safety, despite defendants' arguments that proposed design would harm utility).

Here, the parties agree several feasible, alternative designs exist which incorporate secondary retention devices. In bicycle design terms, "secondary retention device," or "positive retention device," refers to any kind of mechanism that acts as a failsafe in the event a quick release wheel loosens or detaches from a bicycle's dropouts. One of the most common secondary retention devices found in bicycles are "tabbed tips" or "tab tips." Normally, the dropouts to which the quick release skewer attaches are completely smooth. On a bicycle with

tab tips, the dropouts are not flat but have extended, outward-curving edges.  With this design, if a quick release nut and handle are not fully tightened, they may still "sit" in these tab tips and keep the wheel in place even if the front of the bicycle lifts off of the ground.  In other words, tab tips act as a kind of safety railing to hold a quick release wheel that is no longer firmly attached. Another type of secondary retention device is the "peg and eyelet" device, which essentially adds two washers to either side of the quick release skewer; the washers are then attached to the bicycle fork blades using pegs or hooks that connect to holes punched into the washers.

Although Trek agrees that several feasible alternative designs exist, it disputes whether any of these designs—namely, whether any secondary retention device—actually increases bicycle safety.  As discussed below, whether a secondary retention device would have increased the safety of Sanny's bicycle is a key question of fact that a jury must resolve.

### b.  Trek's record of wheel separation claims

Until his death in 1995, Robert Read served as Trek's Director of Engineering and as the primary person tracking and evaluating the safety of Trek's quick release bicycles.  Read investigated all wheel separation claims from 1985 until 1995, and kept a record of reported claims.  Haag Aff. Ex. O.  In 1990, Read made the decision that Trek would incorporate secondary retention devices in all of its quick release bicycles, and Trek initially used both peg and eyelet, and tab tip designs.  Id.; see also Vaughn Aff. Ex. P., at 4.  By 1991, every new Trek bicycle had a secondary retention device of some kind.  Vaughn Aff. Ex. P., at 4.  Sanny's bicycle, manufactured in 1990, was among the last of the bicycles manufactured by Trek without a secondary retention device.

Plaintiffs argue that Trek's own use of tab tips, and peg and eyelet devices demonstrate

the safety benefit that results from secondary retention devices.  Since 1985, Trek has recorded

58 claims of wheel separation.  See Vaughn Aff. Ex. X (Trek's wheel separation claims list).  A

simple review of these claims indicate that the majority of wheel separations were reported from

1985 until the early 1990's, after which the number of incidents reported per year began to

decrease.  See id.  Plaintiffs argue that the year-over-year decrease in wheel separation incidents

was the result of Trek's decision to incorporate secondary retention devices in its bicycles

starting in 1990.  The correlation between decreased incident reports and use of secondary

retention devices, according to Plaintiffs, is evidence that the feasible alternative designs

increase the safety of Trek bicycles.

Trek disputes the necessity of secondary retention devices.  Trek argues that although it

has received claims of wheel separation in quick release bicycles, the number of reported

incidents is extremely low compared to the total number of Trek bicycles sold.  In particular,

Trek argues that it was only aware of nine instances of wheel separation by 1990.  See Haag Aff.

Ex. Y ("Read Dep."), at 152-53.[2]  By that time, Trek had sold over a million bicycles, resulting

in a wheel separation rate of about 0.0009%.  See id. at 80.  Trek also argues that four of these

nine recorded incidents involved bicycles equipped with peg and eyelet style retention devices.

As a result, Trek, through Read, decided bicycles without secondary retention devices had

substantially the same level of safety as bicycles equipped with secondary retention devices.  Id.

at 82-84.  Trek claims that it nevertheless adopted secondary retention devices to avoid

litigation.

---

[2]  Although Read testified that Trek was only aware of nine claims of wheel separation by
January 1990, Trek's documents reflect 11 claims.  Vaughn Aff. Ex. X.  The reason for the
discrepancy is unclear.

Trek also disputes Plaintiffs' interpretation of the larger number of wheel separation claims. At oral argument, Trek stated that of the 58 total claims of wheel separation it recorded, about 32 of the bicycles involved had secondary retention devices, further demonstrating these devices' failure to increase safety. By way of explanation, Trek notes that secondary retention devices are cumbersome, and increase the risk of user error in properly securing a quick release wheel. Trek argues that the decrease in wheel separation claims in the 1990's did not result from any design change; on the contrary, Trek argues the decrease resulted from Trek's campaign to educate riders on the proper use of quick release devices. Plaintiffs respond that although some wheel detachments may have occurred in bicycles designed to hold secondary retention devices, many of the 32 bicycles in question were not actually equipped with such devices at the time of the accidents. Plaintiffs also complain that Trek destroyed most of its files associated with older wheel separation claims, preventing Plaintiffs from further investigating the particular circumstances of each claim. See Pls.' Opp. 37.

As an initial matter, it is necessary to address whether evidence of other wheel separation claims will be admissible at trial, as only facts based on admissible evidence may be considered at the summary judgment stage. See JRT, Inc. v. TCBY Sys., Inc., 52 F.3d 734, 737 (8th Cir. 1995). In the area of product liability litigation, evidence of similar injuries or incidents "may be relevant to prove a product's lack of safety or a party's notice of defects." J.B. Hunt Transport, Inc. v. Gen. Motors Corp., 243 F.3d 441, 444 (8th Cir. 2001). Similar incident evidence also risks raising "extraneous controversial issues," confusing the issues, and being more prejudicial than probative. Id. (citation omitted). As a result, the offering party has the burden of demonstrating that the past incidents are substantially similar to the incident at issue. Id. at 445.

Ultimately, the admission of such evidence is in the trial court's discretion.  Arabian Agric.

Servs. Co. v. Chief Indus., Inc., 309 F.3d 479, 485 (8th Cir. 2002); Hammes v. Yamaha Motor

Corp. U.S.A., Inc., No. 03-6456, 2006 WL 1195907, at *12, n.2 (D. Minn. May 4, 2006).

Here, Trek's prior wheel separation incidents bear relevant similarities to Sanny's

accident.  Every prior incident involved a bicycle with a quick release device, and it is logical to

assume the bicycle wheel detached during foreseeable use.  See, e.g., Schaffner v. Chicago &

N.W. Transp. Co., 541 N.E.2d 643, 660 (Ill. 1989) (reaching same conclusion in similar

circumstances).  Whether the wheel detached due to user error is immaterial, as Trek concedes

user error of the quick release device is a foreseeable cause of injury.  Def.'s Mem. Supp. Summ.

J. [Docket No. 81] ("Def.'s Mem.") 15.  In this case, the parties agree that wheel separation

incidents may be grouped together to demonstrate comparative safety and overall incident

trends.  See, e.g., id. at 14.  In addition, the offered evidence is summary in nature and thus

avoids the risk of unfair prejudicial effect.  As a result, the evidence of Trek's past wheel

separation incidents is likely to be admitted in some form at trial.

Arguing against this conclusion, Trek cites Magistrate Judge Rau's holding that Plaintiffs

failed to demonstrate how Sanny's injuries compare to the majority of injuries suffered in other

wheel detachment accidents.  See Order, Jan. 2, 2013 [Docket No. 69] 8.  Before Judge Rau,

Plaintiffs argued for the appropriateness of punitive damages in part by describing several

specific examples of injuries suffered by Trek bicycle riders.  Judge Rau properly held that

Plaintiffs had failed to demonstrate that injuries as serious as Sanny's had occurred in the

majority of wheel detachment claims.  Id.  As a result, Judge Rau held Plaintiffs had not

demonstrated injuries rising to the level of seriousness required by Minnesota's punitive

damages statute.  Id.  Here, the evidence at issue is not of past injuries, but of the wheel

detachments themselves.  As discussed above, this more limited evidence is probative of the

design's safety and Trek's notice of prior accidents.  See, e.g., Broun, Kenneth, McCormick on

Evidence § 200 (7th ed. 2013) (when evidence of other accidents used to show manufacturer's

notice, similarity to accident at issue "can be considerably less" than for other purposes).  As

such, evidence of past wheel separation claims may be relevant at trial for a purpose other than

that argued in the punitive damages context.

The admissible evidence of Trek's prior wheel separation claims supports a finding that

genuine issues of material fact exist.  Among other things, evidence of prior accidents may

demonstrate: (1) a design defect; or (2) the manufacturer's knowledge that prior accidents had

occurred.  See Lovett v. Union Pac. R. Co., 201 F.3d 1074, 1081 (8th Cir. 2000).  Regarding the

former purpose, evidence of similar accidents may indicate that the product at issue is unsafe and

thus defective.  See id.  Even accidents occurring after the accident in question may be probative

of safety.[4]  See Indep. Sch. Dist. No. 181, Brainerd v. Celotex Corp., 244 N.W.2d 264, 266

(Minn. 1976); Steenson, Michael K., et al., 27 Minn. Practice Series § 12.9 (2012 ed.).

Regarding the latter purpose, a manufacturer's notice of other accidents addresses whether a

manufacturer exercised sufficient care to eliminate any unreasonable risk of harm from

foreseeable uses of its product at the time of design.  See, e.g., Hammond v. Compaq Computer

Corp., No. 06-1670, 2009 WL 3164797, at *4-5 (D. Minn. Sept. 29, 2009) (potential

---

[4] In this case, evidence of accidents occurring after Sanny's injuries may be relevant
because, as Trek concedes, bicycles have a long useful life.  As a result, bicycles manufactured
at the same time as or before Sanny's bicycle may have had wheel detachments after Sanny's
accident.

foreseeability of harm addressed in part whether manufacturer used reasonable degree of care in design).

Trek's history of wheel separation claims creates a question of fact regarding whether Trek exercised reasonable care in its failure to include a secondary retention device in its 1990 design of the bicycle Sanny later purchased. First, the parties dispute the significance of what these prior incidents demonstrate concerning the effectiveness of secondary retention devices. Plaintiffs argue Trek's wheel separation claims decreased in the early 1990's because of Trek's use of secondary retention devices; Trek argues proper education in the use of quick release devices increased safety despite the presence of secondary retention devices. The parties' differing but reasonable views of the same evidence demonstrates a question of fact. See, e.g., Riedl v. Gen. Am. Life Ins. Co., 248 F. 3d 753, 756 (8th Cir. 2001) (citation omitted). Second, the pre-1991 incidents of wheel separation are evidence that Trek had some notice of the risks associated with quick release devices, which creates a question of fact regarding the reasonableness of its decision to forgo secondary retention devices until 1990-91.

In addition, the parties' disagreement over the specifics of the wheel separation evidence itself also precludes summary judgment. The parties simply disagree about how many of the pre-1991 wheel separations involved bicycles that had actually been equipped with secondary retention devices. Neither party has provided any evidence that conclusively resolves the discrepancy; instead, the parties rely on the contradictory recollections of deponents. See Read Dep. 152-53; Vaughn Aff. Ex. QQ ("Bretting Dep.") 81-91. Further, Trek has no evidence showing that any of the bicycles involved in the recorded wheel detachments were actually

equipped with secondary retention devices at the time of detachment.[5]  A direct, factual conflict

over Trek's wheel separation data exists, and at summary judgment this conflict must be

resolved in favor of Plaintiffs.

### c.  Industry standards

#### i.  Industry publications

Industry standards at the time the manufacturer chose the design at issue is one factor in

determining the manufacturer's exercise of reasonable care.  See, e.g., Buchanna v. Diel Mach,

Inc., 98 F.3d 366, 371 (8th Cir. 1996) (interpreting comparable Arkansas law and holding

evidence of compliance with industry standards not conclusive proof of safety, but rather

"competing evidence from which to choose").  Plaintiffs submit excerpts from patents,

publications, books, and other materials indicating bicycle manufacturers and consumers had

discussed the safety of quick release devices well before 1990.  See, e.g., Vaughn Aff. Ex. J

(excerpt from 1984 edition of American Bicyclist and Motorcyclist magazine noting availability

of secondary retention devices).  Trek does not dispute the veracity of these documents, nor does

it offer any reason why Plaintiffs' submitted evidence on this topic should be disregarded.  Thus,

this evidence further establishes a genuine question of material fact, as it suggests Trek knew or

should have known that others in the bicycle industry had acknowledged the risk of harm

resulting from quick release wheel separation, and that other manufacturers had already begun

---

[5]  Trek also argues Plaintiffs have failed to present statistical evidence, such as through a study using epidemiological methods, that secondary retention devices have resulted in statistically significant increases in safety.  However, such an analysis is not necessary to establish a question of fact in a design defect case.  See, e.g., Sobolik, 2011 WL 1258503, at *3 (holding even a single prior accident could establish question of fact); see also Hammond, 2009 WL 3164797, at *4 (finding question of fact although product had been manufactured 1.5 million times and used without incident).

implementing secondary retention devices.

### ii.  Schwinn Bicycles

Plaintiffs also cite the actions of Schwinn Bicycles ("Schwinn"), another bicycle manufacturer, as evidence of the industry standard.  In particular, Plaintiffs describe the development of the "Brilando clip" by Frank Brilando, a retired Schwinn employee.  Testifying in a deposition for previous product liability litigation against Trek, Brilando stated that in the late 1960's and early 1970's Schwinn became concerned about the number of occurrences of quick release wheel separations.  Vaughn Aff. Ex. D ("Brilando Dep."), at 25-27 (testimony from Thurston v. Trek Bicycle Corp., No. PI-96-013351 (Hennepin Dist. Ct. 1998)).  As a result, Schwinn halted sales of a particular bicycle model that used a quick release device.  Id. at 88-89. Brilando then designed and patented the "Brilando clip," two of which affix to the quick release skewer.  When attaching a quick release wheel, the rider then manually clips the other ends of the Brilando clips to specially-mounted pegs extruding from the fork blades.  Id. at 37-40.

Plaintiffs argue Brilando's testimony demonstrates the safety conferred by secondary retention devices in general.  Schwinn began incorporating Brilando clips into its quick release designs in 1976.  From 1968 to 1985, Schwinn received 131 reports of wheel detachments in quick release bicycles without secondary retention devices.  Vaughn Aff. Ex. E (Schaffner Stipulation).  To Brilando's knowledge, Schwinn did not receive a single report of wheel detachment in bicycles equipped with these secondary retention devices from 1976 to 1992, when Brilando retired.  Id. at 55-56.  From this evidence, Plaintiffs argue a jury could reasonably conclude secondary retention devices feasibly increase the safety of quick release bicycles.

Trek responds that Brilando's testimony is both hearsay and irrelevant.  In terms of

admissibility, Trek argues Brilando's deposition transcript is hearsay, and that Plaintiffs never noticed Brilando as an expert witness or submitted an expert report by him.  Even if his testimony was admissible, Trek argues neither Brilando nor Schwinn considered quick release bicycles without secondary retention devices to be defective in the early 1990's.  See Schaffner v. Chicago & N.W. Transp. Co., 515 N.E.2d 298 (Ill. Ct. App. 1987) (affirming jury verdict that a 1973 Schwinn bicycle was not unreasonably dangerous because it lacked secondary retention device), aff'd, 541 N.E.2d 643; Brilando Dep. 149-50.

Based on the current record, at least some of Brilando's deposition testimony from Thurston is likely to be admissible at trial.  Plaintiffs' counsel submitted an affidavit stating Brilando was unavailable as a witness in this case due to his age, physical condition, and deteriorating memory.  Vaughn Aff. ¶ 4.  Also, Brilando's prior deposition was taken in a product liability lawsuit against Trek, in which Trek's previous counsel had the "opportunity and similar motive to develop [the testimony] by direct, cross-, or redirect examination."  Fed. R. Evid. 804(b)(1)(B).  As a result, Brilando's testimony appears to qualify for an exception to the rule against hearsay.  However, Trek is correct that Plaintiffs did not disclose Brilando as an expert witness.  As a result, Brilando's opinions are inadmissible; only his factual knowledge of Schwinn's bicycle designs and safety record will be received in evidence.

Brilando's testimony is an additional factor leading to the conclusion that there is a genuine question of fact for jury consideration.  Brilando testified that Schwinn received zero claims of quick release wheel separations in bicycles equipped with the Brilando clips, which may lead a jury to conclude Schwinn's secondary retention device increased the safety of quick release bicycles.  Also, although Brilando's knowledge was limited in some respects, his

testimony is some evidence of the bicycle industry standards at the time Trek chose the design

for Sanny's bicycle.

### iii.  CPSC rules and ASTM standards

The parties argue at length regarding the significance of rules promulgated by the

Consumer Product Safety Commission (CPSC) for bicycle safety.  The CPSC is tasked with

protecting the public against injury resulting from consumer products, and performs education,

research, and rule-making functions.  The history of how bicycle safety came under the CPSC's

purview is stated in Forester v. Consumer Prod. Safety Comm'n, 559 F.2d 774 (D.C. Cir. 1977),

and a detailed summary is not necessary here.  Of relevance, however, is the CPSC's decision in

1978 to promulgate a rule addressing bicycle wheel hubs.  See 16 C.F.R. § 1512.12.  In §

1512.12, the CPSC required front wheel hubs to have positive retention devices but specifically

exempted quick release bicycles.  Id. § 1512.12(c).

The parties offer very different views of how the CPSC's position on quick release

bicycles evolved.  Plaintiffs argue that bicycle manufacturers had previously only marketed

quick release devices to bicycle racers, and that Schwinn, leading the industry, had only just

begun marketing quick release devices to casual riders by 1978.  Plaintiffs cite evidence that by

2004, the CPSC had begun urging ASTM International (formerly known as the American

Society for Testing and Materials), an organization that adopts voluntary manufacturing

standards, to take the position that all quick release devices should have secondary retention

devices.  See, e.g., Vaughn Aff. Ex. M.  Trek responds that ASTM standards are entirely

voluntary and that if the CPSC had truly determined quick release devices to be unsafe, the

agency would have taken regulatory action.  In addition, Trek cites a CPSC bicycle safety study

from 1994 in which the agency concluded no revisions to its bicycle regulations were required. Haag Aff. Ex. N.

The evidence offered by the parties regarding the CPSC is of limited value. Although Plaintiffs credibly argue the CPSC had begun advocating for voluntary standards adopting the use of secondary retention devices, all of the cited evidence dates from 2004 or later: well after Trek designed Sanny's bicycle. Conversely, Trek's cited study from 1994 does reflect the CPSC's determination that it did not need to revise its safety standards; however, the CPSC's report did not specifically address quick release devices or secondary retention devices. Plaintiffs' evidence also indicates that the CPSC may have chosen to pursue non-regulatory safety standards for quick release devices, and that bicycle companies had failed to report wheel detachments to the CPSC. In short, much of the CPSC evidence does not reflect industry standards in 1990; to the extent any of the evidence is relevant, it is conflicting and further raises questions of fact.

### d. Summary

Ultimately, reasonable minds could disagree as to whether Trek used reasonable care in evaluating the balance between safety and utility at the time of the manufacture of Sanny's bicycle. As Trek concedes, bicycle accidents often result in serious injury, and occasionally in death. Def.'s Mem. 5-7. However, Trek argues that the wheel detachment rate is so small that although serious injury or death is possible, the design at issue cannot be unreasonably dangerous, even if several feasible alternative designs exist. In 1990, Trek considered much of the same evidence now before the Court and decided to forgo secondary retention devices. In Trek's view, these retention devices did not tangibly increase safety and also decreased the

utility of the quick release device.  Weighing the reasonableness of that decision, and the risk of

harm against its seriousness, is a question of fact best decided by a jury.  See Thompson, 456

F.3d at 809.

### 3.  Failure to Warn

In addition to their design defect claim, Plaintiffs allege Trek failed to properly warn

Sanny about the danger of riding a quick release bicycle not equipped with a secondary retention

device.  Under Minnesota law, a plaintiff claiming a failure to warn must show: "(1) the

defendant[] had reason to know of the dangers of using the product; (2) the warnings fell short of

those reasonably required, breaching the duty of care; and (3) the lack of an adequate warning

caused plaintiff's injuries."  Tuttle v. Lorillard Tobacco Co., 377 F.3d 917, 924 (8th Cir. 2004)

(quotation omitted).  To establish causation, a plaintiff must demonstrate that a warning would

have caused him or her to act in a way that would have avoided the injury.  See Ramstad v. Lear

Siegler Diversified Holdings Corp., 836 F. Supp. 1511, 1516 (D. Minn. 1993).

Plaintiffs claim must fail for two reasons.  First, Plaintiffs allege Trek failed to warn

Sanny that his bicycle lacked a secondary retention device.  However, a product warning need

only warn about the inherent dangers and proper use of the product; there is no requirement that

a product warning instruct the user as to other possible designs or products.  See Glorvigen v.

Cirrus Design Corp., 816 N.W.2d 572, 582 (Minn. 2012).

Second, Plaintiffs cannot establish the element of causation.  Sanny testified he had

owned quick release bicycles since the late 1970's and had at least a passing familiarity with

quick release devices since that time.  Sanny Dep. at 11-15.  Sanny had owned this Trek bicycle

for about 16 years before his accident.  See id. at 14.  During the year before his accident, Sanny

testified he installed and removed his quick release wheel every 2 to 4 weeks and agreed that he was "perfectly competent" to do so.  <u>Id.</u> at 14-15.  In addition, Sanny also testified he knew he could crash if he did not properly secure his quick release device.[6]  Sanny Dep. 46-51.  Although causation is usually a question of fact, Sanny's own testimony precludes Plaintiffs' failure to warn claim in this case.  Plaintiffs cannot show how warning Sanny as to the potential dangers and proper use of a quick release device would have caused him to act differently, because Sanny admits he already possessed all of the information that would be included in a legally adequate warning.  <u>See</u> <u>Ramstad</u>, 836 F. Supp. at 1516.

### 4. Post-Sale Failure to Warn

Plaintiffs also allege Trek had a duty to contact Sanny after his purchase of the bicycle to warn him about the risks of using a quick release device without a secondary retention mechanism.  Minnesota has recognized a manufacturer's post-sale duty to warn "only in special cases."  <u>Hodder v. Goodyear Tire & Rubber Co.</u>, 426 N.W.2d 826, 833 (Minn. 1988).  No specific test for establishing a post-sale duty to warn exists, but <u>Hodder</u> noted several factors warranting the recognition of a duty in that case, including:

> (1) the defendant's knowledge of problems with the product since the late 1950's, including the knowledge that the product might explode with little provocation; (2) the hidden nature of the danger; (3) the fact that when explosions did occur, serious injury or death usually resulted; (4) defendant remained in that line of business, continued

---

[6]  At his deposition, Sanny initially disputed knowing how sudden the accident resulting from a wheel detachment could be, testifying, "I don't think anybody has an idea they're going to go crashing to the ground."  Sanny Dep. 48.  Trek's counsel then asked: "So you think you needed someone to tell you beforehand that if the front wheel became detached from the fork that you should have been warned there could be a catastrophic - you could fall off the bike?"  Sanny answered, "No, sir."  Trek's counsel confirmed, "You knew that?"  Sanny responded, "Yes."  <u>Id.</u> at 48-49.

> to sell parts for use with the product and had advertised the product within five years of the plaintiff's injury; and (5) defendant had undertaken a duty to warn of product dangers.

Ramstad, 836 F. Supp. at 1517 (analyzing Hodder).  Several decisions have indicated that "continued service, communication with purchasers, or the assumption of the duty to update purchasers, is a necessary element" for a post-sale duty to warn.  McDaniel v. Bieffe USA, Inc., 35 F. Supp. 2d 735, 741 (D. Minn. 1999) (collecting cases).

As an initial matter, Trek argues Plaintiffs have not properly pled a claim for post-sale failure to warn.  Trek argues that nowhere in the Complaint did Plaintiffs allege sufficient facts to state a claim under the basic notice pleading standards of Rule 8 of the Federal Rules of Civil Procedure and the fair notice requirements of Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Plaintiff responds that the following allegations put Trek on notice of this claim:

> The separation of the front wheel from the front fork of the subject Trek 930 Single Track bicycle and the resulting injuries to Plaintiff John Sanny were caused and contributed by the negligent conduct of Defendant.  Said negligence includes, by way of example, but is not limited to, the following:
> 1. Negligent failure to incorporate a backup safety retention system into the design of the front wheel attaching mechanism to prevent the front wheel from detaching from the frame in the event the primary attaching mechanism came loose;
> 2. Negligent failure to advise customers of alternative designs employing such safety retention systems;
> 3. Negligent failure to advise consumers of the importance of such safety retention systems, and that unintentional misapplication of the primary attaching mechanisms was a known and recurring danger.

Compl. 2.  In addition, Plaintiffs rely on a letter their counsel sent to Trek's counsel before filing the Complaint, in which Plaintiffs cited Hodder and discussed post-sale failures to warn.  Pls.' Opp. 46.

Plaintiffs failed to state a claim for post-sale duty to warn in the Complaint.  Under the pleading standards of Twombly and Ashcroft v. Iqbal, 556 U.S. 662 (2009), plaintiffs must state more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action."  Twombly, 550 U.S. at 555.  Plaintiffs have not even crossed this minimal threshold of stating a claim for post-sale duty to warn.  Nothing in the above-quoted language would put Trek on notice that Plaintiffs had alleged a post-sale duty to warn claim, a claim that arises "only in special cases."  Plaintiffs did not allege Trek had a post-sale duty of any kind, nor did the Complaint even allude to Trek's knowledge of a "hidden danger" or the existence of other Hodder factors.  Although Plaintiffs explicitly discussed a post-sale duty to warn in their letter to Trek's counsel, pre-litigation communications may not supplement legal pleadings.  See, e.g., Garth v. White, No. 4:06-CV-1112 CAS, 2007 WL 2128361, at *1 (E.D. Mo. July 23, 2007).  Allowing such supplementation would defeat the purpose of pleading requirements, and allow plaintiffs to scatter hidden claims among their unfiled, unserved communications.

Even if Plaintiffs had stated a claim for a post-sale duty to warn, they have not demonstrated material questions of fact on that claim.  Plaintiffs attempt to portray the potential risks associated with quick release devices as hidden by Trek from its own employees, making the risk more pernicious in nature and warranting a continuing duty to warn.  But as Judge Rau observed, Plaintiffs' own efforts to demonstrate the widely-known risks associated with quick release devices defeats this argument.  Order, Jan. 2, 2013 at 6-7.  In addition, Plaintiffs have not demonstrated whether Trek undertook a duty to warn consumers, or whether Trek engaged customers in ongoing relationships in a way that would give rise to a post-sale duty to warn.  See McDaniel, 35 F. Supp. 2d at 741.  Finally, while the potential for serious harm exists as a result

of quick release devices, Plaintiffs have not demonstrated that serious harm "usually" results

from use of such devices.  Ramstad, 836 F. Supp. at 1517.  Although no one factor is necessarily

determinative under Hodder, Plaintiffs have not demonstrated the necessary "critical mass" to

establish a post-sale duty to warn in this case.

**B.  Motion to Strike Errata Sheet**

Trek's second motion asks the Court to strike Plaintiffs' expert David Hallman's errata

sheet from the record.  Hallman is a materials/mechanical engineer with Crane Engineering, a

company based in Plymouth, Minnesota.  See Hallman Report.  Hallman possesses degrees in

mechanical engineering, and in materials science and engineering.  He has also conducted

limited research in the area of automobile accidents, and has attended conferences and seminars

about vehicle accidents.  Hallman has never professionally studied or worked on bicycles or

bicycle design.  Plaintiffs consulted Hallman for his opinions not only on the nature of Sanny's

accident, but also regarding Trek's design choices and the safety of quick release devices.

Trek deposed Hallman on November 14, 2012.  At the end of the deposition, neither

Hallman nor Plaintiffs' counsel requested the right to review and make corrections to Hallman's

testimony.  Nevertheless, exactly 30 days later Hallman submitted an errata sheet indicating 57

edits to his deposition testimony.  Many of his changes completely reverse or substantively

amend Hallman's original answers to Trek's deposition questions.  For example, Trek's counsel

asked Hallman about the kind of wheel hub Sanny's bicycle had, and Hallman originally

answered, "I don't remember."  Haag Aff., Jan. 29, 2013 [Docket No. 73] Ex. Q ("Hallman

Dep."), at 50.  On the errata sheet, Hallman changed this answer to "Sanny's bicycle had a

Sansin hub on the front wheel."  Id. at Ex. FF ("Errata Sheet").  In another instance, counsel

asked Hallman if he knew of any engineering standards that might require a bicycle manufacturer to recall older designs, and Hallman answered, "No."  Hallman Dep. 104.  On the errata sheet, Hallman changed this to: "Engineering standards, no.  Engineering ethics (NSPE or ABET) would require it.  An engineer's primary responsibility is to protect the public.  A recall would have done that."  Errata Sheet at 2.  Several of Hallman's edits actually include page and line citations to other depositions.  Hallman did not provide any explanation for his changes.

Trek argues Hallman's errata sheet not only fails to meet the technical requirements of the federal rules, it also abuses the purpose of the rules, making it impossible to fairly depose a witness.  Plaintiffs respond that Hallman's changes reflect clarifications or corrections consistent with Hallman's reported opinions, and that some reflect information with which Hallman later became familiar.

The process for submitting an errata sheet is straightforward.  Under Rule 30(e) of the Federal Rules of Civil Procedure allows a deponent or party, before the deposition is completed, to request the option to review the deposition transcript or recording and sign a statement listing changes "in form or substance" and "the reasons for making them."  Once the transcript or recording is available, the deponent or party making the request has 30 days to review and submit corrections.  See Fed. R. Civ. P. 30(e).

Although the procedural requirements are clear, Courts have divided on the use of errata sheets to make changes beyond basic corrections.  Several courts have followed the reasoning in Lugtig v. Thomas, 89 F.R.D. 639 (N.D. Ill. 1981), in which a deponent made 69 substantive changes to his deposition.  The court held that the phrase "changes in form or substance" plainly allowed any changes, even when those changes contradicted original answers or were otherwise

unconvincing.  Id. at 641.  However, the court required the original deposition testimony to remain a part of the record, and held opposing counsel could read the original deposition to the jury at trial.  Id.  The court also allowed opposing counsel to conduct an additional deposition if the errata sheet made the original deposition "incomplete or useless."  Id. at 642.  These measures, the court held, would check abuse.  Id.

Plaintiffs cite three decisions from this district to support its argument of allowing substantive changes.  See ADT Sec. Servs., Inc. v. Swenson, No. 07-2983, 2010 WL 276234, at *7-8 (D. Minn. Jan. 15, 2010), overruled on other grounds, 2010 WL 2954545; Morse v. Walgreens Co., No. 10-2865, 2011 WL 3468367, at *3 n.3 (D. Minn. Aug. 8, 2011); and Nw. Airlines, Inc. v. Am. Airlines, Inc., 870 F. Supp. 1504, 1508 (D. Minn. 1994).  Although Hallman's corrections far surpass the corrections made in these cases in terms of volume and substance, these decisions did indeed hold a deponent could substantially change one or more aspects of their deposition testimony.

Trek acknowledges a division among courts on the use of errata sheets, but argues that preventing depositions from becoming "take home examinations" is the better view.  See Greenway v. Int'l Paper Co., 144 F.R.D. 322, 325 (W.D. La. 1992).  In Greenway, the plaintiff made 64 significant changes to his deposition via an errata sheet.  Id. at 323.  The court ordered deletion of the changes, holding Rule 30(e) only existed to allow a party to correct errors made by the court reporter.  The rule did not allow a deponent to "alter what was said under oath.  If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses."  Id. at 325.  Numerous courts have agreed.  See, e.g., Norelus v. Denny's, Inc., 628 F.3d 1270, 1281-82 (11th Cir. 2010) (collecting cases).  The Eighth Circuit

has not yet taken a position on either side of the division of authority.

Ultimately, a flexible approach, such as the one articulated by the Third Circuit Court of Appeals, best serves the interests of fairness and efficiency. See EBC, Inc. v. Clark Bldg. Sys., Inc., 618 F.3d 253, 267-68 (3d Cir. 2010). In EBC, the court noted that allowing the original deposition to be read at trial, or allowing a supplemental deposition after the submission of an errata sheet, would offer "cold comfort" to a party that might otherwise have prevailed at summary judgment. See id. at 268. Likening the situation to the court's view of "sham affidavits," the Third Circuit held that a "one-size-fits-all rule" would not be appropriate.[7] Id. at 270. The court thus held district courts have the discretion to strike substantive changes made in errata sheets, if the deponent fails to provide "sufficient justification." Id. EBC's reasoning is persuasive, in particular because the Eighth Circuit has also articulated a flexible, though cautious, approach to striking "sham affidavits." See, e.g., City of St. Joseph v. Sw. Bell Tel., 439 F.3d 468, 475-76 (8th Cir. 2006).

In this case, Hallman's errata sheet will be stricken. Significantly, and unlike in the cases cited by Plaintiffs, neither Hallman nor Plaintiffs' counsel exercised their right to review Hallman's deposition transcript and submit a signed sheet of corrections. Since 1991, Rule 30(e) has required either the deponent or a party to request the right to review and sign before the conclusion of the deposition. Fed. R. Civ. P. 30(e) advisory committee's note. Here, neither Hallman nor Plaintiffs made this request, either before or after the deposition concluded, and

---

[7] The "sham affidavit" doctrine, used in both the Third and Eighth circuits, permits courts to "ignore affidavits that contradict earlier deposition testimony without adequate explanation . . . ." EBC, 618 F.3d at 268; Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1365-66 (8th Cir. 1983).

they have not articulated good cause for failing to do so.  In addition, Hallman did not state a single explanation or justification for his numerous and substantive edits.  Trek's motion to strike could be granted on these bases alone.

Just as importantly, Hallman's edits unquestionably reflect an attempt to bolster the substance and credibility of his testimony, and the submission of these edits occurred just after the deposition deadline had passed and shortly before the dispositive motion deadline.  See Stip. to Amend Scheduling Order [Docket No. 16].  Many of Hallman's "corrections" include citations to the record, to statutes and jury instruction models, and to engineering standards never once mentioned in the original deposition.  Reading Hallman's original deposition to the jury as a counterbalance to his edited testimony would offer "cold comfort" to Trek, which seeks to exclude his expert witness testimony at the dispositive motion stage.  See EBC, 618 F.3d at 268. Similarly, allowing Trek to further depose Hallman as this stage could cause significant inefficiency and delay.  Under the circumstances of this case, Hallman's errata sheet will be stricken.

**C.  Motion to Exclude Expert Testimony**

Finally, Trek moves to exclude Hallman's testimony as Plaintiffs' expert.  Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony.  The rule states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Rule 702 reflects but does not codify the holding of Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) and the cases interpreting Daubert, including Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).  Fed. R. Evid. 702 advisory committee's note.

Under Daubert, trial courts act as "gatekeepers" to ensure that: the proposed expert testimony is useful to the factfinder in deciding the ultimate fact issue; the expert witness is qualified; and the proposed testimony is "reliable or trustworthy in an evidentiary sense. . . ." Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001).  In addition to Rule 702, trial courts may consider several factors set out by Daubert for determining reliability, including: (1) whether the theory can be (and has been) tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory enjoys general acceptance in the relevant scientific community.  Daubert, 509 U.S. at 593-94. Courts have also considered whether "the expertise was developed for litigation or naturally flowed from the expert's research."  Lauzon, 270 F.3d at 687.

No single Daubert or Rule 702 factor is determinative.  Instead, the trial court must evaluate reliability in a flexible manner, as the Daubert factors may not necessarily apply "to all experts or in every case."  Kumho, 526 U.S. at 141.  Thus, the trial court has broad discretion not only in ultimately determining reliability, but also in how it determines reliability.  Id. at 142. Finally, the trial court should generally resolve doubts about the usefulness of an expert's testimony in favor of admissibility.  Marmo v. Tyson Fresh Meats, Inc., 457 F.3d 748, 758 (8th

Cir. 2006).  "Only if the expert's opinion is so fundamentally unsupported that it can offer no

assistance to the jury must such testimony be excluded."   Bonner v. ISP Techs., Inc., 259 F.3d

924, 929-30 (8th Cir. 2001).

Hallman produced two reports.  In support of each, Hallman reviewed patents, Trek's

promotional and safety materials, documents produced in this and other litigation, and the

Minnesota jury instruction guide.  Hallman also visited stores and casually observed bicycles in

use.  In terms of testing, Hallman used equipment to test the strength of properly and improperly

affixed quick release devices on a single Trek bicycle, and he also studied the results from

Trek's similar, internal tests.  See Hallman Dep. 49-50.  Hallman did not similarly test the effect

of secondary retention devices, nor did he review similar testing by another party.  With this

background, Hallman opined that the design of Sanny's bicycle was unreasonably dangerous,

and that tab tips or a similar secondary retention device would have prevented Sanny's accident.

Hallman also evaluated Sanny's bicycle and concluded that Sanny's quick release became loose

while it was locked to a bicycle post outside of his workplace, shortly before Sanny's accident.

### 1.  "Unreasonably Dangerous" Opinion

Trek asserts that Hallman reached his ultimate conclusion—that Sanny's bicycle was

unreasonably dangerous—without reliable bases and without the proper qualifications.  Trek

argues Hallman's definition of "unreasonably dangerous" relies on circular logic and that his

overall opinion is not based on data but on his own self-serving assertions.  It also argues

Hallman neither conducted tests nor conducted a statistically reliable study of data demonstrating

an increase in safety from secondary retention devices.  Trek also argues Hallman has no

professional experience in bicycle safety or design, a prerequisite for experts in this case.

Hallman's ultimate opinion regarding whether Sanny's bicycle was "unreasonably dangerous" must be excluded.  In his deposition, Hallman never clearly articulated his definition for "unreasonably dangerous."  Instead, Hallman circuitously defined an unreasonably dangerous product as one that was "more likely to cause injury" than a product that was not unreasonably dangerous.  Hallman Dep. 5-6.  As discussed above, "unreasonably dangerous" is a key legal consideration in a design defect claim.  While an expert may testify as to the ultimate question before the factfinder, he may be prevented from doing so if his testimony in this regard is more likely to confuse a jury than aid it.  Cf. United States v. Kelly, 679 F.2d 135, 136 (8th Cir. 1982) (allowing expert to testify as to ultimate question in part because testimony used commonly understood legal terms, thus avoiding risk of confusion).

In addition, Hallman did not conduct any testing of secondary retention devices. Hallman tested the reliability of a quick release device operating without a secondary retention mechanism, and also studied similar tests by Trek.  He thus concluded that an improperly-affixed device could easily come loose.  But Hallman conducted no similar analysis for bicycles equipped with secondary retention devices.  On the other hand, because manufacturers have sold various secondary retention devices in the market for many years now, testing is not necessarily a requisite for an opinion about safety.  See, e.g., Young, 428 F.3d at 790.

Here again, however, Hallman did not conduct any repeatable analysis in support of his opinion that a bicycle without secondary retention devices is unreasonably dangerous.  Under Rule 702, the court's primary concern is an expert's methodology, not their conclusions. Bonner, 259 F.3d at 929.  Hallman did not use a particular method to reach his ultimate conclusion.  Instead, he simply reviewed deposition transcripts and Trek's wheel detachment

data and formed his opinion.  See Hallman Dep. 23-25.  Nothing about this opinion derives from

scientifically reliable or repeatable methods; it simply affirms Plaintiffs' view of the evidence

without adding insight.  A jury could, and should, draw its own conclusions about the testimony

and data using common sense.  Hallman's view that Sanny's bicycle was unreasonably

dangerous would not assist the jury.

### 2.  Failure to Warn Opinion

Because the Court grants Trek's motion for summary judgment on Plaintiffs' failure to

warn claim, Hallman's testimony in this area is irrelevant.  Even if Plaintiffs' failure to warn

claim survived, Hallman's testimony would not be admissible.  In the failure to warn context,

experts typically opine regarding a warning's design or content, or whether a warning could have

prevented the accident in question.  See, e.g., Finke v. Hunter's View, Ltd., 596 F. Supp. 2d

1254, 1263 (D. Minn. 2009).  Here, Hallman opines only that Trek should have advised Sanny

and other consumers of the risk in riding without secondary retention devices.  See Pls.' Mem.

Opp. Mot. to Exclude [Docket No. 92] 5; Hallman Aff. Ex. 2 ("Hallman Supp. Report"), at 6.

Put plainly, Hallman's opinions address Trek's legal duty to warn, and must thus be excluded.

### 3.  Opinions Regarding Bicycle Mechanics and Sanny's Accident

Although the above expert opinion testimony previously discussed will be excluded,

Hallman does have admissible testimony which may aid the jury.   Hallman's analysis of how

quick release devices function, and their potential for wheel detachment without secondary

retention devices, are based on mechanical principles within Hallman's expertise and derived

from both Hallman's and Trek's own tests.  Also, testimony derived from Hallman's study of

Sanny's bicycle is based on the close analysis of metal deterioration and usage marks, and is

within Hallman's expertise as a materials and mechanics engineer.  Although Hallman's primary

expertise centers on automobile accidents, many of the same reconstruction principles could

arguably apply here.  Because Trek offers no specific argument against these opinions, and

because the opinions may aid the jury, these opinions will not be excluded at this stage.[8]

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.      Trek's Motion for Summary Judgment [Docket No. 77] is **GRANTED IN PART**

and **DENIED IN PART**.

2.      Trek's Motion to Strike Changes to the Deposition of Plaintiffs' Expert David

Hallman [Docket No. 70] is **GRANTED.**

3.      Trek's Motion to Exclude Testimony of Plaintiffs' Expert [Docket No. 76] is

**GRANTED IN PART** and **DENIED IN PART**; the testimony of David Hallman

is limited as set forth above.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  May 8, 2013.

---

[8]  Trek focused on the wholesale exclusion of Hallman's testimony, and did not make specific arguments as to each of Hallman's opinions.  The admissibility of opinions not excluded here may be addressed by the parties at or before trial.